UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

| | |
|---|---|
| USA STAFFING SERVICES, LLC, | Case No: 8:25-bk-04358-CPM |
| STAFFING MANAGEMENT GROUP, LLC, | Case No: 8:25-bk-04366-CPM |
| MK ULTRA INVESTMENTS, LLC | Case No: 8:25-bk-04368-CPM |
| Debtors. | Chapter 11 Jointly Administered |

_____/

## DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

### ARTICLE I
### SUMMARY

This Second Amended Joint Chapter 11 Plan of Reorganization proposes to pay creditors of USA Staffing Services, LLC ("**USA**") and Staffing Management Group, LLC ("**SMG**") from the income generated by the continued business operations of USA. SMG will be liquidated and then SMG and MK Ultra will be dissolved. Mr. Kolinski will also contribute new value to the allowed creditors of MK Ultra Investments, LLC ("**MK Ultra**") (collectively with USA and SMG, the "**Debtors**"), in full satisfaction of all Allowed Claims (defined below).

On June 27, 2025 (the "**Petition Date**"), the Debtors each filed their Voluntary Petitions for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). Pursuant to an order of this Court dated June 27, 2025, the Debtors' Chapter 11 cases are being jointly administered under In re: USA Staffing Services, LLC, Case No. 8:25-bk-04358-CPM, which has been designated as the Lead Case. As a result, the Debtors are filing this Second Amended Joint Chapter 11 Plan of Reorganization (together with all amendments, attachments and exhibits, the "**Plan**").

This Plan provides for fourteen (14) classes of creditors: eight (8) classes consisting of the secured creditors, three (3) classes of general unsecured creditors, and three (3) classes of equity

interests.

This Plan also provides for the payment of administrative claims and allowed priority claims, which are not classified pursuant to the Bankruptcy Code. All creditors should refer to Articles II through VI of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. ***Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.***

The Debtors filed their First Amended Plan of Reorganization (Doc. No. 114) on October 6, 2025. Since this time, the Debtors, Change Capital, and Alliance HR, LLC have engaged in extensive negotiations and conversations about treatment under the Plan. As discussed in the Debtors' Disclosure Statement, (Doc. No. 113), Alliance HR, LLC asserts substantial claims against the Debtors, and the Debtors assert counterclaims and other causes of action against Alliance HR, LLC (see also 25-ap-341-CPM).

The Debtors and Change Capital also have engaged in fruitful discussions regarding Change Capital's asserted secured claim in each of the Debtor's cases. The parties disagree on the extent of Change Capital's security, among other things. To resolve all disputes, and allow for the confirmation of a plan of reorganization (which all parties believe is better than a liquidation of the Debtor entities), the Debtors file this Second Amended Plan of Reorganization with the specific approval and support of both Change Capital and Alliance HR, LLC.

**ARTICLE II**
**CLASSIFICATION AND TREATMENT OF ADMINISTRATIVE EXPENSE**
**CLAIMS, PRIORITY TAX CLAIMS, AND ADMINISTRATIVE EXPENSE CLAIMS**

2.1     Unclassified Claims.  Under section §1123(a)(1), administrative expense claims, "gap" period claims in an involuntary case allowed under §502(f) of the Code, and priority tax claims are not in classes.

2.2     Administrative Expense Claims.  Each holder of an administrative expense claim allowed under § 503 of the Code and "gap" period claims in an involuntary case allowed under §502(f) of the Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtors.  The Debtors estimate administrative expense claims to be approximately $140,000.00, consisting of accountants, professional fees (including attorneys' fees), United States Trustee fees, and any miscellaneous administrative fees. To the extent that administrative expense claimants agree to any treatment other than payment in full on the Effective Date of the plan, administrative expense claimants shall receive an advance on their full outstanding claim amounts on any successful fraudulent transfer recovery or any other debt collection efforts engaged in or initiated by the administrative expense claimants leading to recovery of funds owed to the Debtors.

Priority Tax and Other Claims, if any.  The Code requires that, with respect to a class of claims of a kind referred to in §§507(a)(1), (4), (5), (6) and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment, or the class agrees to deferred cash payments.

The Code also requires with respect to an unsecured claim of a kind specified in §507(a)(8), the holder of such claim will receive on account of such claim regular installment payments in cash, (i) of a total value, as of the Effective Date (defined below) of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for

relief under §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under § 1122(b)).

2.3     <u>Statutory Fees</u>. All fees required to be paid by 28 U.S.C. §1930 that are owed on or before the Effective Date of this Plan have been paid or will be paid on the Effective Date.

2.4     <u>Prospective Quarterly Fees</u>. All quarterly fees required to be paid under 28 U.S.C. §1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code.

2.5     <u>Claims and interests shall be treated as follows under this Plan</u>:

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan.

1.     *Classes of Secured Claims Encumbering Assets*

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estates (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing **USA's secured prepetition claims** and the proposed treatment under the Plan:

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| 1 | REV Capital (California) Inc. ("REV Capital"). The Class 1 Claims of RevCap are secured by a first priority lien on and security interest in all of the assets of USA. | Unimpaired | RevCap's Allowed Class 1 Claim (and any contract rights between the Debtors and RevCap) shall be assumed, be paid and continue on and through the Effective Date in accordance with the Factoring and Security Agreement dated January 26, 2024, as amended on or about June 27, 2025. The Debtors and |

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| | | | RevCap may execute any such further and necessary documentation to effectuate their continued factoring relationship and RevCap's retained lien to the extent necessary, without further order of the Court. |

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| 2 | The Change Capital Secured Claim in the allowed amount of $920,000, secured by a lien subject to the terms of an intercreditor agreement to be entered by REV Capital and Change Capital in all the assets of USA pursuant to the Change Capital Security Agreement and 100% of the membership interests in USA pursuant to the Change Capital USA Staffing Pledge Agreement and 100% of the membership interests in SMG pursuant to the Change Capital USA Staffing Pledge Agreement. | Impaired | Change Capital filed a secured proof of claim No. 8 in the amount of $2,307,169.70. This claim is secured by all assets of USA and SMG, including SMG's equity interests in Everest and USA, as well as 100% of MK Ultra's ownership interests in SMG, pursuant to the Change Capital Loan Documents (See Claim 8). Following the Effective Date, the Debtors will pay the Change Capital Secured Claim through quarterly payments to Change Capital over 6 years, which shall be due by the 15th of the following month following the end of each fiscal quarter. The first such payment shall be due on May 15, 2026. The remainer of Change Capital's claim shall be treated as an Allowed Unsecured Claim in Class 9 in the amount of $1,000,000.00 (representing Change Capital's deficiency claim under the Change Capital Loan Facility).<br><br>Additionally, if the Debtors' actual tax liability owed to the IRS and other tax entities turns out to be less than the projected amount of $1,140,000.00, the first $200,000 in any savings in these tax payments would be paid first to Change Capital, resulting in a dollar for dollar increase in the Change Capital Secured Claim (i.e., if Change Capital recovers $200,000 in tax savings, total payments on account of its secured claim will equal $1,120,000). Thereafter, any additional savings over $200,000 will be split 50/50 between an increase in the Change Capital Secured Claim and an increase in the available distributions on account of Allowed Unsecured Claims in Class 9. |
| 3 | The Claims of Mulligan Funding to the extent | Impaired | Mulligan Funding filed a secured proof of claim No. 2 in the amount of |

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| | allowed under §506 of the Bankruptcy Code. The Class 3 Claims of Mulligan Funding in the aggregate amount of $455,580.50 are secured by the assets of USA. | | $455,580.50. This claim is duplicative of Class 5 Claim. The Debtors believe this Claim is wholly unsecured as to USA. As such, the unsecured portion of this Claim shall be treated as an Allowed Class 9 Claim. |

The following chart lists all classes containing **SMG's secured prepetition claims** and the proposed treatment under the Plan:

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| 4 | The Allowed Secured Claim of Change Capital as to SMG, secured by all the assets of SMG (including, without limitation, 100% of the membership interests in USA). | Impaired | SMG will satisfy the Class 4 Allowed Claim of Change Capital through Change Capital's Class 2 Treatment. |
| 5 | The Claims of Mulligan Funding to the extent allowed under §506 of the Bankruptcy Code. The Class 5 Claims of Mulligan Funding in the aggregate amount of $455,580.50 are secured by the assets of SMG. | Impaired | Mulligan Funding filed a secured proof of claim No. 1 in the amount of $455,580.50. This Claim is duplicative of Class 3. The SMG Debtor believes this claim is wholly unsecured. As such, any Allowed Class 5 Claim shall be treated as an Allowed Class 10 Claim. |

The following chart lists all classes containing **MK Ultra's secured prepetition claims** and the proposed treatment under the Plan:

| Class | Description | Impairment | Treatment |
|-------|-------------|------------|-----------|
| 6 | The Claims of BHG Financial to the extent allowed under §506 of the Bankruptcy Code. | Impaired | BHG Financial filed secured proofs of claim 6 and 7 in the amount of $104,590.46 and $45,256.89 respectively. The MK Ultra Debtor believes these claims are wholly |

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| | The Class 6 Claims of BHG Financial in the aggregate amount of $ 317,233.58 are secured by the assets of MK Ultra. | | unsecured. Accordingly, any Allowed portion of the Class 6 Claim shall be treated as an Allowed Class 11 Claim. |
| 7 | The Claims of the United States Small Business Association to the extent allowed under §506 of the Bankruptcy Code. The Class 7 Claim of the SBA in the aggregate amount of $160,908.26 is secured by the assets of MK Ultra. | Impaired | The SBA filed a secured proof of claim No. 2 in the amount of $160,908.26. The MK Ultra Debtor believes this claim is wholly unsecured. Accordingly, any Allowed portion of this Class 7 Claim shall be treated as an Allowed Class 11 Claim. |
| 8 | The Claims of Change Capital to the extent allowed under §506 of the Bankruptcy Code. The Class 8 Claims of Change Capital are secured by MK Ultra's membership interests in SMG (the "**SMG Membership Interests**"). MK Ultra is a guarantor of the Change Capital debt. | Impaired | MK Ultra will satisfy the Class 8 Allowed Claim of Change Capital through Change Capital's Class 2 Treatment. |

2.    *Classes of Priority Unsecured Claims*

The Bankruptcy Code requires that, with respect to a class of claims of a kind referred to in §§507(a)(1), (4), (5), (6) and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment, or the class agrees to deferred cash payments.

The Bankruptcy Code also requires with respect to an unsecured claim of a kind specified in §507(a)(8), the holder of such claim will receive on account of such claim regular installment

payments in cash, (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under § 1122(b)).

Debtors project that their overall tax liability is approximately $1,140,000.00 owed to the IRS and other state and county taxing authorities. If the Debtors' actual tax liability turns out to be less than the projected amount, the first $200,000 in any savings in these tax payments would be paid first to Change Capital resulting in a dollar for dollar increase in the Change Capital Secured Claim (i.e., if Change Capital recovers $200,000 in tax savings, total payments on account of the Change Capital Secured Claim will equal $1,120,000). Thereafter, any additional savings over $200,000 will be split 50/50 between an increase in the Change Capital Secured Claim and an increase in the available distributions to all Allowed Class 9 Claimants. Other than the claims set forth below, the Debtors are unaware of any priority unsecured claims:[1]

SMG: IRS; $ Unknown

SMG: Florida Department of Revenue; $ Unknown

SMG: Hillsborough County Tax Collector; $ Unknown

USA: Alabama Department of Labor; $ Unknown

USA: Alabama Department of Revenue; $ 87.15

USA: Alaska Department of Revenue; $ Unknown

USA: Arizona Department of Revenue; $ Unknown

USA: Industrial Commission of Arizona; $ Unknown

---

[1] The Debtors are merely stating the existence of these priority claims, but are not waving any rights with respect to these claims, including the right to object in accordance with applicable deadlines.

USA: Arkansas Department of Finance and Administration; $ Unknown

USA: Department of Labor and Workforce Development (Arkansas) ; $ Unknown

USA: California Franchise Tax Board; $ Unknown

USA: Employment Development Department (California); $ Unknown

USA: Colorado Department of Revenue; $ Unknown

USA: Colorado Department of Labor and Employment; $ Unknown

USA: Connecticut Department of Revenue Services; $ Unknown

USA: Department of Employment Services (Washington D.C.); $ Unknown

USA: Florida Department of Revenue; $ Unknown

USA: Florida Commerce (Formerly Dept. of Econ); $ Unknown

USA: Georgia Department of Revenue; $ Unknown

USA: Hillsborough County Tax Collector; $ Unknown

USA: Hawaii Department of Taxation; $ Unknown

USA: Idaho Department of Labor; $ Unknown

USA: Idaho State Tax Commission; $ 30.00

USA: Illinois Department of Employment Security; $454.43

USA: Illinois Department of Revenue; $ Unknown

USA: Indiana Department of Revenue; $ Unknown

USA: Iowa Department of Revenue; $ Unknown

USA: Iowa Department of Revenue; $ Unknown

USA: Iowa Department of Workforce Development; $ Unknown

USA: Kansas Department of Labor; $ Unknown

USA: Kansas Department of Revenue; $ Unknown

USA: Kentucky Department of Revenue; $ Unknown

USA: Kentucky Education and Labor Cabinet; $ Unknown

USA: Louisiana Department of Revenue; $ 1,285.96

USA: Louisiana Workforce Commission; $ 392.49

USA: Maine Department of Labor; $ Unknown

USA: Maine Revenue Services; $ Unknown

USA: Maryland Department of Labor; $ Unknown

USA: Comptroller of Maryland; $ Unknown

USA: Executive Office of Labor and Workforce (Massachusetts); $ Unknown

USA: Massachusetts Department of Unemployment Assistance; $ Unknown

USA: Massachusetts Department of Revenue; $2,854.45.

USA: Michigan Department of Treasury; $ Unknown

USA: Michigan Department of Labor and Economic Opportunity; $ Unknown

USA: Minnesota Department of Revenue; $ Unknown

USA: Minnesota Department of Labor and Industry; $ Unknown

USA: Mississippi Department of Revenue; $ Unknown

USA: Mississippi Department of Employment Security; $ Unknown

USA: Missouri Department of Revenue; $ 6,824.59.

USA: Missouri Department of Labor and Industrial Relations; $ Unknown

USA: Montana Department of Revenue; $ Unknown

USA: Montana Department of Labor and Industry; $ Unknown

USA: Nebraska Department of Revenue; $ 1,708.83.

USA: Nebraska Department of Labor; $ Unknown

USA: Nevada Department of Taxation; $ Unknown

USA: Nevada Department of Employment, Training & Rehabilitation (DETR);$ Unknown

USA: Nebraska Department of Revenue; $ Unknown

USA: Nebraska Department of Labor; $ Unknown

USA: New Hampshire Department of Revenue Administration; $ Unknown

USA: New Hampshire Department of Employment Security; $ Unknown

USA: New Jersey Division of Taxation; $ Unknown

USA: New Jersey Department of Labor and Workforce Development; $ Unknown

USA: New Mexico Taxation and Revenue Department; $ Unknown

USA: New Mexico Department of Workforce Solutions; $ Unknown

USA: New York State Department of Taxation and Finance; $ $4,968.69.

USA: New York Department of Labor; $2,733.01.

USA: North Carolina Department of Revenue; $ Unknown

USA:   North Carolina Department of Labor; $ Unknown

USA: Ohio Department of Taxation; $421.45.

USA: Ohio Department of Job and Family Services; $ 288.01.

USA: Oklahoma Tax Commission; $ Unknown

USA: Oklahoma Employment Security Commission; $ Unknown

USA: Oregon Department of Revenue; $ $2,426.44.

USA: Oregon Employment Department; $ Unknown

USA: Pennsylvania Department of Revenue; $ Unknown

USA: Pennsylvania Department of Labor & Industry; $ Unknown

USA: Rhode Island Division of Tax; $ Unknown

USA: Rhode Island Department of Labor & Training; $ Unknown

USA: South Carolina Department of Revenue; $ Unknown

USA: South Carolina Department of Employment and Workforce; $ Unknown

USA: South Dakota Department of Revenue; $ Unknown

USA: South Dakota Department of Labor and Regulation; $ Unknown

USA: Tennessee Department of Revenue; $ Unknown

USA: Tennessee Department of Labor & Workforce Development; $ Unknown

USA: Finance Commission of Texas; $ Unknown

USA: Texas Workforce Commission; $ $23,700.78.

USA: Utah State Tax Commission; $ Unknown

USA: Utah Labor Commission; $ Unknown

USA: Vermont Department of Taxes; $ Unknown

USA: Vermont Department of Labor; $ Unknown

USA: Virginia Department of Taxation; $ $10,737.74.

USA: Virginia Department of Labor and Industry; $ Unknown

USA: Washington State Department of Revenue; $ Unknown

USA: Washington Department of Labor and Industry; $ Unknown

USA: West Virginia Tax Division; $ $428.84.

USA: West Virginia Division of Labor; $ Unknown

USA: Wisconsin Department of Revenue; $ Unknown

USA: Wisconsin Department of Workforce Development; $ Unknown

USA: Wyoming Department of Revenue; $ Unknown

USA: Wyoming Department of Workforce Services; $ Unknown

USA: City and County of Denver; $ Unknown

USA: City of Fairlawn; $164.24.

USA: Kansas City Missouri; $ Unknown

USA: IRS; $4,195.61, plus estimated amount of $333,000.00.

MK Ultra: Massachusetts Department of Revenue; $2,854.00

All other state and federal taxing authorities: Unknown

3.    *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.  The following chart identifies the Plan's proposed treatment of **general unsecured claims** against **USA**:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| 9 | Allowed General Unsecured Creditors of USA of approximately $710,000.00, plus (i) the Allowed Unsecured Claim of Change Capital in the amount of $1,000,000.00 (representing Change Capital's deficiency claim under the Change Capital Loan Facility) and (ii) Alliance HR LLC's allowed claim of $1,700,000.00 per the parties' compromise. | Impaired | Class 9 consists of the general unsecured claims of USA.<br><br>Each holder of an allowed Class 9 claim will receive its *pro rata* share of USA's Proposed Plan Payments (as defined in the Plan Projections, Exhibit B to the Disclosure Statement) after payment of secured claims, including the Change Capital Secured Claim, over the five-year plan period in full and complete satisfaction of all Allowed Class 9 Claims.<br><br>Additionally, if the Debtors' actual tax liability owed to the IRS and other tax entities turns out to be less than the projected amount of $1,140,000.00, the first $200,000 in any savings in these tax payments would be paid first to Change Capital resulting in a dollar for dollar increase in the Change Capital Secured Claim (i.e., if Change Capital recovers $200,000 in tax savings, total payments to Change Capital on account of the Change |

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| | | | Capital Secured Claim will equal $1,120,000). Thereafter, any additional savings over $200,000 will be split 50/50 between an increase in the Change Capital Secured Claim and an increase in the available distributions to all Allowed Class 9 claimants. |

The following chart identifies the Plan's proposed treatment of **general unsecured claims** against **SMG**:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| 10 | General Unsecured Creditors of SMG Approximately $625,000, plus the deficiency claim of Change Capital. | Impaired | Class 10 consists of the general unsecured claims of SMG.<br><br>Each holder of an allowed Class 10 claim will receive its *pro-rata* share of the liquidation of SMG's assets after Change Capital recovers its Class 4 security interest in full (if any). The SMG Debtor does not believe there will be any recovery for the Class 10 creditors. |

The following chart identifies the Plan's proposed treatment of **general unsecured claims** against **MK Ultra**:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| 11 | General Unsecured Creditors of MK Ultra of approximately $375,000, plus the unsecured portion of Change Capital's claim as to MK Ultra. | Impaired | Class 11 consists of the general unsecured claims of USA.<br><br>MK Ultra has no assets. MK Ultra will dissolve on the Effective Date, and no creditors will receive recovery from the MK Ultra Debtor. |

*Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e. equity interest) in the Debtors. In a limited liability company (LLC), the equity interest holders are the members.

The following chart sets forth the Plan's proposed treatment of the Debtors' equity interest holders.

| Class | Description | Treatment |
|---|---|---|
| 12 | Membership Interests in USA | Post-confirmation, Mr. Kolinski will continue to manage the Reorganized Debtor and all prepetition members of USA shall retain their membership interests. Mr. Kolinski will execute all documentation necessary to demonstrate that he will hold 100% of the membership interests of the Reorganized Debtor directly. |
| 13 | Membership Interests in SMG | Post-confirmation, SMG will be liquidated and will be dissolved following a complete liquidation. |
| 14 | Membership Interests in MK Ultra | MK Ultra will dissolve as of the Effective Date. |

2.7 <u>Additional Payment Terms and Conditions.</u> First, to the extent any class is determined to be an empty class, it shall automatically be collapsed. Second, the Debtors may prepay any amounts in whole or in part without any penalty. Third, to the extent necessary, the Debtors request that the Bankruptcy Court confirms the Plan under the cramdown provisions of the Bankruptcy Code on the basis that the Plan is fair and equitable, is proposed in good faith, does not discriminate unfairly, and for any and all other reasons announced in open court, with respect to each Class that is Impaired and has not accepted the Plan. Fourth, the disbursing agent shall be USA as a reorganized debtor.

**ARTICLE III**
**ALLOWANCE AND DISALLOWANCE OF CLAIMS**

3.1 <u>Disputed Claim.</u> A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order and, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtors or another party in interest has filed an objection; or

(ii) no proof of claim has been filed, and the Debtors have scheduled such claim as disputed, contingent or unliquidated. Any objection to claims shall be filed within sixty (60) days of the Effective Date. The Debtors will use best efforts, within their sole discretion, to eliminate any unnecessary or baseless claims.

       3.2      <u>Delay of Distribution on a Disputed Claim.</u>  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

       3.3      <u>Settlement of Disputed Claims.</u>  The Debtors will have the power and authority to settle and compromise a Disputed Claim with Court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedures.

**ARTICLE IV**
**<u>PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

       4.1      <u>Assumed Executory Contracts and Unexpired Leases</u>.

       Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The foregoing lists how USA will cure and compensate the other party to such contract or lease for any such defaults.

       If you object to an assumption, and if applicable, an assignment, of your unexpired lease or executory contact under the Plan, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

       All executory contracts and unexpired leases that are not listed or have not previously been assumed, and if applicable assigned, or are not the subject of a pending motion to assume will be treated as follows:

(a) The lease with VW Credit will be assumed and assigned to the USA Debtor from the SMG Debtor.

(b) The office lease will be assumed and assigned to the USA Debtor from the SMG Debtor.

(c) The contract with Bullhorn will be assumed and assigned to USA as a part of the liquidation of SMG, as USA Debtor believes it can utilize this asset for the benefit of creditors.

(d) All other executory contracts of SMG will be rejected as of the Effective Date.

(e) All executory contracts of the USA Debtor will be assumed by USA and paid a cure amount of $0.

(f) All executory contracts of MK Ultra will be rejected as of the Effective Date.

You should consult your adviser or attorney for more specific information about particular contracts or leases. If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to confirmation of the Plan.

The deadline for filing a proof of claim based on a claim arising from the rejection of a lease or contract is thirty (30) days after the date of the order confirming the Plan. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### ARTICLE V
### MEANS FOR IMPLEMENTATION OF THE PLAN

5.01    Funding Source for Plan Payments.

The Plan will provide that USA contribute the Projected Plan Payments over six (6) years

for the quarterly secured payments to Change Capital on account of the Change Capital Secured Claim and five (5) years for all other plan distributions which will be deemed to satisfy all Allowed Claims in full.

The Projected Plan Payments will be augmented by Mr. Kolinski's contributed new value ($150,000 of his salary per year, totaling $750,000 in total).

SMG's assets will be liquidated in an orderly liquidation, and the sale proceeds will be distributed to Change Capital (first) and unsecured creditors (second) to the extent such proceeds allow[2].

MK Ultra has no assets and will dissolve on the Effective Date.

To the extent the proposed Plan is not confirmed, the Debtors will utilize a business broker to sell USA's and SMG's assets in an arm's length transaction after a fulsome marketing process.

The Debtors believe this Plan maximizes value to creditors, as opposed to the alternative of a liquidation of all entities (in which unsecured creditors would likely receive far less, if not $0) or a sale of the enterprise, which provides much more uncertainty.

5.02    Provisions Related to Alliance HR.

With respect to Alliance HR, LLC, the Debtors and Alliance agree to treat Alliance's Class 7 claim as an unsecured claim in Class 9 in the Allowed amount of $1.7 million.  Alliance agrees to vote its Allowed Class 9 Claim in favor of the Plan.

The Debtors' Adversary Proceeding against Alliance (25-ap-314-CPM) will be abated, as well as any pending motions and hearings concerning Alliance's claim or right to vote in this bankruptcy.

On the Effective Date of confirmation, the Adversary Proceeding will be dismissed with

---

[2] The assets of SMG are of nominal value, as such, any remnant assets including the Bullhorn contract will be transferred to USA to retain title.

prejudice, each party to bear their own attorneys' fees and costs and the Debtors and Alliance will exchange mutual releases. Alliance will dismiss with prejudice its state court action under the same terms and conditions, and the Debtors will dismiss their counterclaim against Alliance, and each agrees not to file any other State Court actions against each other or the Debtors or their affiliates or principals with respect to their claim in this case or the substance of the disputes between the Debtors and Alliance.

Alliance will immediately provide Debtors with the necessary information in its possession for the 2025 Q1 tax filings. Alliance HR, LLC will reasonably cooperate with Debtors and designated payroll tax filer to provide all necessary information in Alliance's possession to file the Debtors' requisite payroll tax reports. This provision shall be confirmed and treated with respect to 9019 of the Bankruptcy Code and incorporated into any order confirming this Plan. This resolution between Alliance and the Debtors is integral to the Debtors' plan and must be approved as a part of it.

5.03    Provisions Related to Change Capital.

As of the Effective Date, the Change Capital Secured Claim shall be an Allowed Secured Claim subject to the terms of an intercreditor agreement to be entered by REV Capital and Change Capital) in the amount of $920,000, subject to increase in accordance with the terms of this Plan relating to savings of projected vs. actual tax liability. On and after the Effective Date, the Liens and security interests securing the Change Capital Secured Claim pursuant to the Change Capital Security Agreement, Change Capital USA Staffing Pledge Agreement, and Change Capital SMG Pledge Agreement shall secure the Change Capital Secured Claim and the Debtors' obligations under this Plan related thereto, and such Liens and security interests shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described

in and subject to the Change Capital Security Agreement, the Change Capital USA Staffing Pledge Agreement, and the Change Capital SMG Pledge Agreement, to the same extent and priority as that which was established in respect thereof under applicable non-bankruptcy law and subject to the terms of an intercreditor agreement to be entered by REV Capital and Change Capital, and (ii) as to the Debtors, not subject to avoidance, recharacterization, subordination, discharge, or release under any applicable law, the Plan or the Confirmation Order under facts existing as of the Effective Date of the Plan. Notwithstanding the foregoing or any other provisions herein, the Plan shall not be construed to suggest or imply that the Kolinski Guaranty is secured or nondischargeable or prohibited from any rights, claims, or defenses which may arise after the Effective Date.

On or before (as applicable) the Effective Date, the Debtors and Mr. Kolinski shall be authorized to execute, deliver, and enter into and perform under appropriate documentation (including, without limitation, new or amended financing statements) to assign, amend, modify, or supplement the Change Capital Loan Documents, and take any other action necessary or desirable, to effectuate the transactions contemplated by this Plan, including, without limitation, (i) the pledge by Mr. Kolinski of his membership interests in the Reorganized Debtor, (ii) Change Capital's continuing Lien and continuing security interest in (x) all assets of USA, SMG, and Everest, and (y) 100% of the membership interests in SMG held by MK Ultra, and (iii) all other obligations of the Debtors, Reorganized Debtor and Mr. Kolinski to Change Capital under this Plan, in each case, to the extent such rights existed as of the Petition Date, on and following the Effective Date, without further (a) notice to or order or other approval of the Bankruptcy Court, (b) act or omission under applicable law, regulation, order, or rule, (c) vote, consent, authorization, or approval of any Person, or (d) action by Holders of Claims or interests.  Prior to the Effective

Date, the Debtors and Change Capital shall negotiate in good faith with respect to the terms of any necessary assignments, amendments, supplements or other modifications to the Change Capital Loan Documents to effectuate the transactions contemplated by the Plan and Confirmation Order. The Change Capital Loan Documents (as may be modified, amended, or supplemented in accordance with the terms of this Plan and the Confirmation Order or otherwise by agreement between the Debtors and Change Capital) shall constitute the legal, valid, binding and authorized obligations of Mr. Kolinski and the Reorganized Debtor (and, as applicable, SMG, MK Ultra, and Everest prior to their liquidation or dissolution in accordance with the terms of this Plan or otherwise), as applicable, enforceable in accordance with their terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan (including, without limitation, Sections 7.1 and 7.2 hereof) or the Confirmation Order under facts existing as of the Effective Date of the Plan. Notwithstanding the foregoing or any other provisions herein, the Plan shall not be construed to suggest or imply that the Kolinski Guaranty is secured or nondischargeable or prohibited from any rights, claims, or defenses which may arise after the Effective Date.

      5.04   <u>Mr. Kolinski's Substantial Contribution and Release by Change Capital After Plan Period.</u>

      The Plan and Mr. Kolinski's substantial contribution of a significant portion of his salary on and after the Effective Date is conditioned on Change Capital's release of the remainder of the Kolinski Guaranty at the end of the 6-year Plan period in accordance with the terms of this Plan. If Change Capital receives a minimum recovery of $1.3 million under the Plan with no defaults in payments due to Change Capital under the Plan or the Confirmation Order (subject to Section 7.3 of this Plan), Change Capital will release the Kolinski Guaranty at the end of the Plan period of 6

years. If Change Capital does not receive a minimum of $1.3 million under the Plan (and/or following any default in Plan payments to Change Capital), the Kolinski Guaranty shall remain in effect (including, without limitation, payment of Change Capital's attorneys' fees and legal expenses incurred in connection with the enforcement of the Kolinski Guaranty to the extent the Change Capital Loan Documents provide for such payments under such circumstances) for the difference between $1.3 million and payments actually received by Change Capital under this Plan. For the avoidance of doubt, the Kolinski Guaranty shall remain in effect in accordance with its terms, and Change Capital will not release Mr. Kolinski from his obligations under the Kolinski Guaranty, until Change Capital receives a recovery of $1.3 million.

**Release of Kolinski Guaranty After Plan Period: Following completion of the Plan Payments to Change Capital after the six-year Plan Period, provided that (i) no default to Change Capital occurred that was not cured in accordance with Section 7.3 of this Plan, and (ii) Change Capital has received a recovery of at least $1.3 million from and after the Effective Date in accordance with the terms of this Plan and the Confirmation Order, and except as otherwise provided in the Plan or arising from intentional fraud, gross negligence, or willful misconduct, in exchange for Mr. Kolinski's substantial contribution to the Plan which largely inures to Change Capital's benefit, Change Capital and Mr. Kolinski shall release one another, effective as of the Kolinski Release Effective Date, from all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever existing prior to the Kolinski Release Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each party would have been legally entitled to assert against the other based on or relating**

to debts incurred by or related to the Debtors, including the Kolinski Guaranty, which are dealt with in the Plan. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Mr. Kolinski's Substantial Contribution and this Release are integral components of the Plan. Change Capital's assent to the foregoing release shall be made affirmatively on its ballot, consenting to the terms of this Release, as a condition of confirmation of the Plan. The Parties agree that they shall execute such further documentation as may be necessary or desirable to effectuate this release as of the Kolinski Release Effective Date.

5.05    Debtors' Release of Change Capital

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of Change Capital to facilitate and implement the Plan, except (i) for the right to enforce the Plan or any right or obligation arising thereunder that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, on and after the Effective Date, Change Capital is deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or

collectively) or on behalf of the holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, Change Capital's authorization of the Debtors' use of cash collateral, including all adequate protection payments made to Change Capital during the Chapter 11 Cases, the Debtors, the Change Capital Loan Facility, the Change Capital Loan Documents and any and all related agreements, instruments, and/or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this section (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing Change Capital from Claims or Causes of Action arising from an act or omission that is judicially determined by a final order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date actions, omissions, or obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Plan.

5.04    Exculpation and Limitation of Liability

Except as otherwise set forth in the Plan, the Debtors and their agents, employees, officers, directors, managers, and shareholders; and the professionals for the Debtors (acting in such capacity) (collectively, the "**Exculpated Parties**") shall not have or incur any liability to any person or entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, the administration of the Plan or property to be distributed pursuant to Plan, and any and all actions taken or omitted to be taken in connection with this Chapter 11 Case or the operations, monitoring, or administration of the Debtors or its Estate during this Chapter 11 Case for the period on and after the Petition Date and through the Effective Date; provided, however, this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party or breach of any contract or any fiduciary duty.

## ARTICLE VI
## GENERAL PROVISIONS

6.1    Definitions and Rules of Construction.  The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

(a)    Administrative Expense shall mean those expenses described in Section 503 of the Bankruptcy Code.

(b)    Allowed Claim shall mean a claim (a) for which a Proof of Claim has been filed with the Court on or before the Bar Date fixed by the Court or (b) which was scheduled and

26

filed with the Court pursuant to Bankruptcy Rule 1007 and not listed as disputed, contingent or unliquidated as to amount. In either case, Allowed Claim means a claim which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Bankruptcy Rule 3003, or an order of the Court which is no longer subject to appeal of this Plan.

(c)      Allowed Priority Claim shall mean an Allowed Claim for which the holder asserts and is determined to be entitled to priority under Section 507, et seq., of the Code, in an amount allowed by Final Order of the Court upon a request pursuant to Section 503(a) of the Code.

(d)      Allowed Secured Claim shall mean an Allowed Claim arising on or before the petition date that is secured by a valid lien on property of the Debtors which is not void or voidable under any state or federal law including any provision of the Code and is supported by actual value in the Creditor's collateral consistent with Section 506 of the Code.

(e)      Allowed Unsecured Claim shall mean an Allowed Claim against the Debtors, which is not an Allowed Priority Claim, Allowed Secured Claim or claim of an Equity Interest Holder.

(f)      Assets shall mean all the assets of the Debtors' estates.

(g)      Bar Date means the last date for filing a Proof of Claim against the Debtors in these Chapter 11 Cases, which is September 5, 2025.

(h)      Business Day means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

(i)      Cause of Action means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense,

remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

(j)     Change Capital Loan Agreement means that certain *Master Business Loan Agreement*, dated as of February 29, 2024, by and among SMG, USA, Everest, MK Ultra, Mr. Kolinski, and Change Capital.

(k)     Change Capital Loan Documents means the (i) Change Capital Loan Agreement, (ii) Change Capital Promissory Note, (iii) Change Capital Security Agreement, (iv) Change Capital USA Staffing Pledge Agreement, (v) Change Capital SMG Pledge Agreement, (vi) Kolinski Guaranty, (vii) and all other documents, instruments, letters, notes, and agreements, including, without limitation, security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes delivered for or with respect to the Change Capital Loan Facility, in each case, as may be amended, restated, supplemented or modified from time to time.

(l)     Change Capital Loan Facility means the loan facility provided by Change Capital to SMG, USA, and Everest prior to the Petition Date pursuant to the Change Capital Loan Documents.

(m)     Change Capital Promissory Note means that certain *Commercial Promissory Note*, dated as of November 30, 2024, by and among SMG, USA, Everest, and Change Capital.

(n)     Change Capital Secured Claim means the Allowed Secured Claim of Change Capital against USA pursuant to this Plan, which shall be deemed allowed against USA in the amount of $920,000 and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairments or any other challenges under applicable law or regulation by any entity, as of the Effective Date, for any reason of fact existing as of the Effective Date.

(o)     Change Capital Security Agreement means that certain *Commercial Security Agreement*, dated as of February 29, 2024, by and among USA, SMG, Everest, and Change Capital.

(p)     Change Capital SMG Pledge Agreement means that certain Pledge Agreement, dated as of February 29, 2024, by and among MK Ultra and Change Capital, pursuant to which MK Ultra pledged 100% of its membership interests in SMG to Change Capital.

(q)     Change Capital USA Staffing Pledge Agreement means that certain *Pledge Agreement,* dated as of February 29, 2024, by and between SMG and Change Capital.

(r)     Claim shall have the meaning set forth in Section 101(5) of the Code.

(s)     Code shall mean the United States Bankruptcy Code, being Title 11 of the United States Code.

(t)     <u>Confirmation</u> means the entry by the Bankruptcy Court of the Order confirming and approving this Plan or any subsequent version of such Plan. Upon the Confirmation Order becoming final and non-appealable, this will establish the "Effective Date" of the Plan.

(u)     <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan.

(v)     <u>Debtors' Counsel</u> shall mean Daniel Etlinger and the law firm of Underwood Murray, P.A. (collectively "Underwood Murray") of Tampa, Florida.

(w)     <u>Entity</u> means an "entity" as defined in section 101(15) of the Bankruptcy Code.

(x)     <u>Everest</u> means Everest Recruiting Services, LLC.

(y)     <u>Holder</u> shall mean (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the Debtors or the Reorganized Debtor as the case may be, have received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as shown on the register that is maintained by the Debtors or as otherwise determined by order of the Bankruptcy Court.

(z)     <u>Insider</u> shall have the meaning as set forth in Section 101(31) of the Code.

(aa)     Kolinski Guaranty means that certain *Continuing Guaranty*, dated as of February 29, 2024, executed by Mr. Kolinski in favor of Change Capital.

(bb)     Kolinski Release Effective Date means the date that Change Capital confirms in writing (which may be through email from counsel) to Mr. Kolinski that Change Capital has received a recovery of at least $1.3 million from and after the Effective Date in accordance with the terms of this Plan and the Confirmation Order, which confirmation shall not be unreasonably delayed or withheld.

(cc)     Lien means a "lien" as defined in section 101(37) of the Bankruptcy Code.

(dd)     Mr. Kolinski means Matthew Kolinski, a natural Person with an address of 4412 West San Carlos Street Tampa, FL 33629.

(ee)     Person means a "person" as defined in section 101(41) of the Bankruptcy Code.

(ff)     Petition Date means June 27, 2025.

(gg)     Proposed Plan Payments mean the payment stream to creditors as proposed in the Plan Projections attached to the Disclosure Statement as Exhibit B.

(hh)     Reorganized Debtor shall mean USA Staffing Services, LLC on and following the Effective Date.

(ii)     Secured Creditor shall mean the owner and holder of an Allowed Secured Claim.

(jj)     Unsecured Creditor shall mean the holder and owner of an Allowed Unsecured Claim.

6.2     Effective Date.  The Effective Date for the Plan may not occur unless each of the conditions set forth below are satisfied.

a. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors, and it shall have become a Final Order and shall not have been stayed, modified, or vacated on appeal.

b. All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto, including receipt of any necessary funding pursuant to this Plan.

6.3     <u>Severability</u>.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

6.4     <u>Binding Effect</u>.  The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

6.5     <u>Captions</u>.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.6     <u>Controlling Effect</u>.  Unless a rule of law or procedure is supplied by federal law, including the Code or the Federal Rules of Bankruptcy Procedure, the laws of the State of Florida govern this Plan and any agreements, documents and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

6.7     <u>Corporate Governance</u>.  The Plan does not intend to change the structure of the Debtors' corporate governance to include different classes of shares or non-voting shares and to the extent applicable, the Debtors shall amend its by-laws to prohibit the issuance of nonvoting

shares. The Plan proposes to liquidate SMG and MK Ultra. Mr. Kolinski will hold 100% of the membership interests in USA directly on and following the Effective Date.

6.8    _Retention of Jurisdiction._  The Bankruptcy Court will retain jurisdiction as provided by the Bankruptcy Code and other applicable law.  The Bankruptcy Court will retain jurisdiction to determine all issues related to the Debtors' Plan, assumption or rejection of executory contracts, claims disputes, discharge and releases, and enforcement of any Plan default.

6.9    _Retention of Jurisdiction for Specific Purposes._ In addition to the general retention of jurisdiction, after Confirmation of the Plan and until these Chapter 11 Cases are closed, the Bankruptcy Court shall retain jurisdiction of these Chapter 11 Cases for the following specific purposes:

(a)    to resolve any disputes concerning any exculpation of, or limitation of liability as to, a non-debtor (including any Professional - as defined in § 327 of the Code) hereunder or the injunction against acts, employment of process or actions against such non debtor (including any Professional) arising hereunder.

(b)    any causes of action or claims brought by the Debtors, including but not limited to claims against Alliance Sentry Event Services Inc., Critical Access Network LLC, and Gaia 5G.

## ARTICLE VII
## RELEASE AND DISCHARGE

7.1    _General Injunction._ **PURSUANT TO §§105, 524, 1123, 1129, AND 1141 OF THE BANKRUPTCY CODE, TO PRESERVE AND IMPLEMENT THE VARIOUS TRANSACTIONS CONTEMPLATED BY AND PROVIDED FOR IN THE PLAN, AS OF THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL PERSONS THAT HAVE HELD, CURRENTLY**

**HOLD OR MAY HOLD A CLAIM OR OTHER DEBT OR LIABILITY, THAT IS DISCHARGEABLE PURSUANT TO THE TERMS OF THE PLAN ARE AND SHALL BE PERMANENTLY ENJOINED AND FOREVER BARRED TO THE FULLEST EXTENT PERMITTED BY LAW FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS, DEBTS OR LIABILITIES, OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHTS OR OBLIGATIONS UNDER THE PLAN OR THE PLAN DOCUMENTS: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST DEBTORS, OR THE PROPERTIES; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST DEBTORS OR THEIR ASSETS; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST DEBTORS OR THEIR ASSETS; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO DEBTORS; OR (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER. DEBTORS SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK ENFORCEMENT OF THIS GENERAL INJUNCTION PROVISION, WHICH IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION.**

    7.2   <u>Discharge.</u>  On the Effective Date, the Debtors each will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; or (ii) to

the extent provided in § 1141(d)(6). Notwithstanding anything to the contrary in this Plan or the Confirmation Order: (x) the Liens and security interests held by Change Capital in (i) 100% of the membership interests in USA pursuant to the Change Capital USA Staffing Pledge Agreement (as may be amended or modified to reflect the ownership by Mr. Kolinski of 100% of the membership interests in reorganized USA (as Reorganized Debtor) on and following the Effective Date), (ii) all assets of USA, SMG, and Everest pursuant to the Change Capital Security Agreement, and (iii) 100% of the membership interests in SMG held by MK Ultra pursuant to the Change Capital SMG Pledge Agreement, and (y) all other obligations of the Debtors under the Change Capital Loan Documents preserved under this Plan shall continue in full force and effect on and following the Effective Date; remain binding and enforceable obligations of the applicable Debtors in accordance with their respective terms; and shall not be discharged by this Plan, the Confirmation Order, or otherwise by operation of the Bankruptcy Code or applicable law.

7.3    Default. If the Reorganized Debtor fails to make any payment to Change Capital as required under the Plan, and such default is not cured within fourteen (14) Business Days following receipt by the Reorganized Debtor of written notice of such default (the "Cure Period"), from Change Capital, then Change Capital may pursue all rights and remedies available to it under this Plan, the Confirmation Order, and applicable law (including all rights and remedies available under the Change Capital Loan Documents (each as in effect on and after the Effective Date in accordance with this Plan and the Confirmation Order). Notwithstanding the foregoing, if the Reorganized Debtor disputes the existence of the alleged payment default, the Reorganized Debtor shall have the right during the Cure Period to seek a determination from the Bankruptcy Court, on an expedited basis, as to whether a payment default has occurred. Unless the Bankruptcy Court enters an order (i) ruling that a payment default has not occurred, or (ii) enjoining or otherwise

staying Change Capital's exercise of remedies, in each case, prior to the conclusion of the Cure Period, then following the expiration of the Cure Period, Change Capital may pursue all available rights and remedies.

<h1 style="text-align:center">ARTICLE VIII<br>NO LIABILITY FOR TAX CLAIMS</h1>

8.1    Unless a taxing Governmental Authority has asserted a Claim against the Debtors before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be allowed against the Debtors or the Reorganized Debtor or their respective members, officers or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their affiliates, or any other person or entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

<h1 style="text-align:center">ARTICLE IX<br>UNCLAIMED DISTRIBUTIONS</h1>

9.1    Any cash, assets, or other property to be distributed under this Plan that remains unclaimed or otherwise not deliverable to the Person or Governmental Unit entitled thereto as of one hundred and twenty (120) calendar days after the distribution, shall become vested in the Reorganized Debtor to be applied toward the funding of this Plan.  In any such event, such Person's or Governmental Unit's Claim shall no longer be deemed to be Allowed, and such Person or Governmental Unit shall be deemed to have waived its rights to such payments or distributions under this Plan pursuant to § 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distributions.

Dated: January 6, 2026.

Respectfully submitted,

USA Staffing Services, LLC,
Staffing Management Group, LLC,
MK Ultra Investments, LLC,

By: /s/Matthew Kolinski
Matthew Kolinski, Manager


/s/ *Daniel E. Etlinger*
Daniel E. Etlinger
Florida Bar Number 77420
UNDERWOOD MURRAY, P.A.
100 N. Tampa Street
Suite 2325
Tampa, Florida 33602
(813) 540-8401
Email: detlinger@underwoodmurray.com
        detlinger@ecf.courtdrive.com